UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ET TRADING, LTD, <br><br> Plaintiff, <br><br> v. <br><br> CLEARPLEX DIRECT, LLC, et al., <br><br> Defendants. | Case No.:15-CV-00426-LHK <br><br> **ORDER DENYING EX PARTE APPLICATION FOR TRO** <br><br> Re: Dkt. No. 9 |

On February 11, 2015, Plaintiff ET Trading, Ltd. ("Plaintiff" or "ET Trading") filed an ex parte application for a temporary restraining order ("TRO") to enjoin Defendants' sale, promotion, or distribution of any ClearPlex automotive film products in the People's Republic of China and the use of certain trademarks. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing scheduled for March 3, 2015.

I. BACKGROUND

　A. Factual Background

Plaintiff filed its complaint on January 29, 2015. ("Compl."), ECF No. 1. Plaintiff is an entity organized under the laws of the People's Republic of China with its principal place of

1
Case No.: 15-CV-00426-LHK
ORDER DENYING EX PARTE APPLICATION FOR TRO

business in Tianjin, China. *Id.* ¶ 1. Defendant ClearPlex Corp. ("CP-Corp") is a Utah corporation with its principal place of business in Morgan Hill, California. *Id.* ¶ 2. Defendant ClearPlex Direct, LLC ("CP-Direct") is a California limited liability company, with its principal place of business in Rocklin, California. *Id.* ¶ 3.

According to Plaintiff, CP-Corp produces and distributes ClearPlex Film, which is a "protective laminate[] for transparent surfaces such as automobile windshields," in addition to related accessories. *Id.* ¶ 11. CP-Direct is a distributor for CP-Corp. *Id.* Effective June 12, 2013, ET Trading and CP-Corp entered into an exclusive distribution agreement ("Agreement"), which appointed ET Trading as the "exclusive distributor for the promotion, marketing, distribution, and sale of the Products in [China]." *Id.* ¶¶ 15, 17; *Id.* Exh. 3 ("Agreement"). The term of the Agreement was five years, beginning on July 1, 2013, and was agreed to terminate on July 1, 2018 absent renewal. Compl. ¶ 16. The Agreement also provided for a six-month trial period, at the end of which ET Trading and CP-Corp were to communicate in writing their intent to either continue or terminate the Agreement. *Id.* ¶ 23. Plaintiff avers that CP-Corp affirmed its intent to continue the agreement by issuing a "Certificate of Authorized Distribution," declaring that effective December 8, 2013, ET Trading was the authorized, exclusive distributor of ClearPlex Films in China, Taiwan, Hong Kong, and Macao. *Id.* ¶ 26. The Agreement required ET Trading to purchase a minimum of 300 rolls of ClearPlex Film within the first six months of the agreement, and 1000 rolls within the first year. *Id.* ¶ 24. The Agreement did not otherwise require minimum purchases for the remaining four years. *Id.* Plaintiff exceeded the minimum required purchases of 300 rolls in the first six months and 1000 rolls in the first year. *Id.* ¶ 28.

Plaintiff alleges that it "worked diligently to promote and market" ClearPlex Film in China, and "expended substantial time and money to sell the products, build the ClearPlex brand, and train its sales personnel." *Id.* ¶ 27. ET Trading developed a network of "approximately 800 ClearPlex Film installers to which it sold" ClearPlex Film. *Id.*

Beginning in January 2014, ET Trading alleges that it and its installers began

"experiencing quality problems with the ClearPlex Film," which included "blurring on the film, adhesive residue marks, and problems with glare." *Id.* ¶ 30. ET Trading communicated the problems to CP-Corp, which agreed to refund "approximately $42,000 plus $3,000 shipping expense . . . [but] $23,000 was never given to ET," in credit or otherwise. *Id.* ET Trading received further complaints in May 2014 and September 2014 that the film was tearing, scratching, and that the film's top coat would peel away after installation. *Id.* ¶ 31. Plaintiff again communicated these problems to CP-Corp. *Id.* Plaintiff alleges that these quality issues "became so problematic that they substantially and negatively impacted ET's ability to sell ClearPlex Film and place new orders for film." *Id.* ¶ 32. Plaintiff did not place any additional orders for ClearPlex Film after August 2014. *See id.* ¶ 39; *id.*, Exh. 6.

In or around October and November 2014, Plaintiff learned that "ClearPlex products were being offered for sale to ET's installer network by sources other than ET." *Id.* ¶ 33. As the "influx of products confused ET's customers and hurt its ability to sell the Products," ET complained to CP-Corp. *Id.* In November 2014, Plaintiff discovered that Nanchang Aika Trading Co., LTD ("Aika"), was representing to ET's installer network and others that it was the authorized distributor of ClearPlex products in China. *Id.* ¶ 34. CP-Corp had also listed Aika as its distributor on its website. *Id.* Plaintiff alleges that CP-Corp used CP-Direct to "circumvent ET's exclusive distributorship in China," by authorizing CP-Direct to distribute ClearPlex Film in China. *Id.* ¶ 35. According to Plaintiff, CP-Direct entered into an exclusive distributor agreement with Aika in October 2014, with CP-Corp's authorization and knowledge. *Id.*

On December 23, 2014, ET Trading then "insisted that CP-Corp honor the exclusivity rights under the Agreement." *Id.* ¶ 36. The next day, on December 24, 2014, CP-Corp indicated that it would only do so if "'ET Trading agrees to purchase 50% more ClearPlex film in 2015 than [it] purchased in 2014,' beginning in January 2015." *Id.* ¶ 36. On January 21, 2015, CP-Corp posted an announcement on its website that it and CP-Direct had entered into an exclusive distributor agreement with Aika, and that Aika had the exclusive right to market, distribute, and

sell all ClearPlex products in China. *Id.* ¶ 37. That same day, CP-Corp's CEO, Peter Jensen, notified Plaintiff by email that "ClearPlex has no choice but to change our distributor agreement in China," as Plaintiff had not purchased additional product in five months. *Id.* ¶ 39. Jensen copied officers of CP-Direct on the email to Plaintiff. *Id.*; Compl. Exh. 6.

Plaintiff alleges, on information and belief, that CP-Corp and CP-Direct have supplied Aika with ClearPlex products that are subject to the Agreement and that Aika has sold or offered to sell these products in the Chinese market, including to ET's network of installers. *Id.* ¶ 40. Plaintiff further alleges that Defendants' conduct has "confused ET's customers and prospective customers as to the entity that is the exclusive distributor," "severely hindered" Plaintiff's ability to sell ClearPlex products, "misappropriated ET's network of installers," and "eroded ET's good will in this market." *Id.* ¶ 41. Accordingly, Plaintiff alleges three causes of action against Defendants: (1) breach of contract; (2) intentional interference with contractual relations; and (3) violations of California Business & Professions Code § 17200.

### B. Procedural Background

Plaintiff filed its complaint on January 29, 2015. ECF No. 1. On February 11, 2015, Plaintiff filed the instant ex parte application for a temporary restraining order ("TRO"), and an order to show cause why a preliminary injunction should not be issued. ECF No. 9. On February 12, 2015, the Court issued an order directing Defendants to file a response to Plaintiff's application. ECF No. 10. The parties filed a stipulation regarding the TRO briefing schedule, which the Court granted in part and denied in part on February 17, 2015. ECF No. 14. Defendants filed their opposition to Plaintiff's ex parte application on February 23, 2015. ECF No. 16. Plaintiff filed a reply on February 25, 2015. ECF No. 20.

## II. LEGAL STANDARD

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,

4

887 F. Supp. 1320, 1323 (N.D. Cal. 1995). "A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted) (emphasis in original).

**III. DISCUSSION**

The Court need not address all of the *Winter* factors because the Court finds that Plaintiff has failed to carry its burden of demonstrating that it will be irreparably harmed absent a temporary restraining order. As discussed below, the injuries Plaintiff has clearly shown are monetarily compensable, and the Court concludes that Plaintiff has otherwise failed to clearly show irreparable harm.

Injunctive relief is only available when legal remedies are "inadequate." *See Weinberger v. RomeroBarcelo*, 456 U.S. 305, 312 (1982) (the basis for injunctive relief is irreparable injury and the inadequacy of legal remedies). Thus, "[a] plaintiff is not entitled to an injunction if money damages would fairly compensate [her] for any wrong [s]he may have suffered." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595 (1952). "[P]urely monetary injury is compensable, and thus not irreparable." *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 850–51 (9th Cir. 1985) ("The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm . . . ." (internal citations and quotations omitted).

Plaintiff alleges monetary damages resulting from Defendants' alleged breach of contract and intentional interference with contractual relations. As to these alleged injuries, the Court finds

5

Case No.: 15-CV-00426-LHK
ORDER DENYING EX PARTE APPLICATION FOR TRO

that Plaintiff has failed to make a clear showing that legal remedies would be inadequate. Plaintiff's own submissions to the Court indicate that monetary damages would be sufficient to remedy Plaintiff's alleged injuries. The Court notes that Plaintiff avers specific monetary damages in the complaint. *See, e.g.*, Compl. ¶ 49 ("As a proximate result of CP-Corp's breaches, ET has suffered harm in an amount to be proved at trial, but in no event less than $800,000); ¶ 45 ("CP-Corp breached the Agreement by failing to pay volume-based rebates that are owed to ET, totaling at least $92,000."). Plaintiff alleges that Defendants' wrongful conduct has resulted in Plaintiff's inability to sell its existing inventory and resulted in a "dramatic drop" in Plaintiff's sales and income. *See* Declaration of Christine Pu, ECF No. 9-2, ¶¶ 47–48. As described in Plaintiff's complaint, these injuries are monetarily compensable and can be remedied with damages in an amount "to be proven at trial." Compl. ¶ 49 (breach of contract claim); *id.* ¶ 55 (intentional interference with contract claim); *see also* Compl., Prayer for Relief. Plaintiff offers no argument or factual basis for why its lost revenues would not be fully compensable by a damages award. *See Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (holding it was "well established" that injuries in the form of lost revenue are not normally irreparable).

Plaintiff also argues that it has demonstrated irreparable harm by showing a "threatened loss of prospective customers or goodwill." *See* App. at 17–18 (quoting *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). Plaintiff is correct that the threatened loss of prospective customers or goodwill may constitute irreparable harm. However, the Court concludes that Plaintiff has failed to make a "*clear showing*" that there is a *likelihood* of irreparable injury, rather than a mere possibility. Plaintiff cites and relies on *Stuhlbarg*, but the Ninth Circuit's "possibility" of irreparable harm standard as applied in *Stuhlbarg* was explicitly overruled by the Supreme Court in *Winter*. *See* 555 U.S. at 20; *see also* App. at 16 (quoting *Stuhlbarg*, 240 F.3d at 841, and "possibility" of irreparable harm standard). Instead, Plaintiff bears the burden of putting forth sufficient evidence to establish a likelihood of irreparable harm absent

a temporary restraining order. In the instant case, that would require Plaintiff to clearly show that absent injunctive relief, Plaintiff would likely suffer the loss of prospective customers or goodwill. *See Lopez*, 680 F.3d at 1072.

Having considered the declarations and allegations put forth by Plaintiff, the Court concludes that Plaintiff has failed to clearly show a likelihood of irreparable harm. Plaintiff has submitted the declaration of Christine Pu, an employee of ET Trading who is responsible for business development. *See* ECF No. 9-2. To substantiate Plaintiff's allegation of irreparable harm, Pu states:

> Based on the communications that ET has received from its distributors and installers, I believe that [Defendants' conduct has] damaged ET's good will and reputation. The complaints we have received indicate that at least some of the distributors and installers in ET's sales network now perceive ET as dishonest or unscrupulous. This is evidenced in the low sales levels that we continue to experience.

("Pu Decl."), ECF No. 9-2, ¶ 49. As an initial matter, Pu's statement offers little factual basis for her conclusion. Pu does not clarify when these communications were received, or from whom. Moreover, Pu also states that Plaintiff had been receiving quality complaints from distributors, installers, and customers starting as early as January 2014. *Id.* ¶ 28. More specifically, Pu declares "[a]s a result of these quality problems, ET experienced a slow-down in moving its existing inventory of ClearPlex Film and as a result, it did not place any new orders of ClearPlex Film after August 2014." *Id.* ¶ 29. Based on Pu's declaration, it is unclear whether any loss of potential customers, goodwill, or reputation is actually the result of Defendants' new exclusive distributor agreement with Aika, rather than the result of over a year of quality problem complaints. Furthermore, Pu's declaration also supports the inference that any injury to Plaintiff would be fully compensable through a damages award. *See, e.g.*, *id.* ¶ 27 (explaining ET has an inventory of 410 rolls), ¶ 8 (explaining profit per roll).

The Court also agrees with Defendants that Plaintiff's submissions do not clearly show a likelihood of irreparable injury "*in the absence of the requested injunctive relief.*" Opp. at 7–8. As

discussed above, Pu's declaration casts significant doubt on Plaintiff's assertion that a temporary restraining order enjoining Defendants from selling ClearPlex products through Aika would resolve Plaintiff's sales and reputation problems. Another ET employee declaration provides that "[s]ome [distributors] expressed that they did not want to order ClearPlex Film from ET because of the confusion over which company was the authorized supplier . . . and because of the quality issues with ClearPlex Film that were still unresolved." ECF No. 9-3 ("Li Decl."), ¶ 6. Plaintiff's own submissions support the conclusion that Plaintiff's loss of prospective customers and goodwill is directly related, at least in part, to the quality problems that distributors, customers, and installers had been complaining of for over a year prior to CP-Corp's announcement of the Aika deal. The Court has no basis to conclude that issuing a TRO enjoining Defendants from distributing ClearPlex Film through Aika would address this other apparent cause of Plaintiff's sales and reputational problems. As such, Plaintiff has failed to "show specifically that the preliminary injunction it seeks against [Defendants] is likely to redress its injuries caused by" Defendants' alleged wrongful conduct. *See Vegan Outreach, Inc. v. Chapa*, 454 F. App'x 598 (9th Cir. 2011).

Plaintiff also contends that Defendants' presence at a major automotive trade show in Beijing, China, from March 7, 2015 to March 10, 2015, "would be disastrous to ET's reputation and sales." *See* App. at 18. Plaintiff does not explain, however, how Defendants' presence would cause any more alleged reputational injury than has already occurred based on Defendants' prior conduct. Plaintiff specifically avers that Defendants' conduct has already caused confusion amongst distributors. While this past injury may well support a finding of liability or recovery of damages, injunctive relief is not available for past injuries: instead Plaintiff bears the burden of showing imminent, concrete harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiff has put forth no evidence that Defendants' presence at the trade show would cause Plaintiff further reputational injury or deter potential customers.

The Court notes that Plaintiff relies heavily on cases involving trademark and copyright

infringement in support of its application for a TRO. Some of those cases, for instance, *Aviara Parkway Farms, Inc. v. Agropecuaria La Finca, S.P.R. de R.L*, No. 08-2301, 2009 WL 249790 (S.D. Cal. Feb. 2, 2009), apply the pre-*Winter* "possibility" of irreparable harm standard. Others, such as *Innersvingen v. Sports Hoop, Inc.*, No. 12-5257, 2012 WL 3048363 (C.D. Cal. July 26, 2012), not only apply the pre-*Winter* "possibility" standard, but also presume irreparable injury based on allegations of trademark infringement. *Id.* at *2. However, the Ninth Circuit has joined the other circuits in rejecting a presumption of irreparable injury in trademark cases, and in holding that "the *eBay* principle—that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case." *Herb Reed Enters., LLC v. Florida Ent'mt Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (overruling *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999)).

Moreover, even assuming that *Aviara Parkway Farms* and *Innersvingen* remained good law, the Court finds both cases factually distinguishable. In *Aviara Parkway Farms*, the court found irreparable harm because the defendant's "allegedly tenuous financial position and status as a Mexican organization [might] thwart any attempts to recover a potential monetary award," and the commodities at issue were 'perishable agricultural goods . . . of limited quantity and subject to market price fluctuations, rendering calculation of damages uncertain." *Aviara Parkway Farms*, 2009 WL 249790, at *3. Here, in contrast, Plaintiff has not shown that damages calculations would be uncertain, or that Defendants are judgment proof, or that collecting a damages award from Defendants would be difficult. *See id.* While Plaintiff cites *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991), for the proposition that difficulty in valuating damages can support a finding of irreparable harm, Plaintiff offers no argument or factual basis for concluding that damages would be uncertain in the instant case. To the contrary, Plaintiff specifically identifies some of the costs incurred in developing goodwill and brand recognition. *See* Pu Decl. ¶ 17 ($100,000 at trade shows); ¶ 19 ($8000 per month on advertising).

9

Case No.: 15-CV-00426-LHK
ORDER DENYING EX PARTE APPLICATION FOR TRO

In *Innersvingen*, the defendant was "selling substandard products under Plaintiff's . . . trademark," causing consumer confusion and reputational injury. *See* 2012 WL 3048363, at *2. Moreover, the *Innersvingen* plaintiff had submitted evidence establishing that the defendants' conduct was causing the loss of customers and goodwill, as customers believed they were being "overcharged for [the plaintiff's] authentic products." *Id.* In the instant case, Plaintiff has not alleged trademark infringement or put forth specific evidence establishing consumer confusion or reputational injury. *See also Herb Reed*, 736 F.3d at 1250–51 (requiring factual evidence of irreparable injury in trademark infringement action). The Court therefore finds that Plaintiff has failed to make the requisite clear showing that a TRO would be appropriate here. *See Lopez*, 680 F.3d at 1072.

## IV. CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's ex parte application for a TRO and order to show cause.

**IT IS SO ORDERED.**

Dated: March 2, 2015

_____
LUCY H. KOH
United States District Judge

10
Case No.: 15-CV-00426-LHK
ORDER DENYING EX PARTE APPLICATION FOR TRO